IMPERIAL BRASS MFG. CO. v. NELSON.

(Circuit Court of Appeals, Seventh Circuit. January 7, 1913.)

No. 1,936.

PATENTS (§ 328*)—ANTICIPATION—COMPRESSION PIPE COUPLING.
    The Burgess patent, No. 906,099, for a compression pipe coupling, *held*
    void for anticipation by a device in all practical respects the same, known
    and in public use prior to the application of the patentee.

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Illinois; Arthur L. Sanborn, Judge.

Suit in equity by the Imperial Brass Manufacturing Company against Alexander Nelson, doing business under the name of A. Nelson Manufacturing Company. Decree for defendant, and complainant appeals. Affirmed.

For opinion below, see 194 Fed. 165.

George E. Waldo, of Chicago, Ill., for appellant.
Arthur F. Durand, of Chicago, Ill., for appellee.

Before BAKER, SEAMAN, and KOHLSAAT, Circuit Judges.

KOHLSAAT, Circuit Judge. Appellant, herein termed complainant, filed its bill to enjoin infringement of claims 3 and 4 of patent No. 906,099, granted to W. S. Burgess on December 8, 1908, for a compression coupling, of which patent complainant was, by due assignment, the owner. The invention covers a union or coupling for firmly connecting the ends of pipes or rods to each other, or to any desired structure, without solder or brazing. The claims sued on read as follows, viz.:

"3. In combination, a pair of tubular coupling-members threaded one into the other, the inner end of the inner coupling-member being annularly recessed and shouldered to receive the end of the member to be coupled, and a hard-metal sleeve inclosed within the coupling-members and tapered longitudinally to a bendable annular edge, the larger end of this sleeve abutting against the outer coupling-member and the thin tapered edge entering the recessed entrance end of the other member and having contact only with the inner annular corner thereof, for the purpose set forth.

"4. In combination, a pair of tubular couplings and means for adjustably connecting them, one of the couplings being provided with an internal shoulder against which the coupled member abuts and with a flaring entrance end, and a hard-metal sleeve tapered forwardly to a thin bendable edge, the larger end of this sleeve having abutment against one of the coupling-members and its tapered end extending into the flared mouth of the other member and having an annular contact near its tapered end with the flared entrance end aforesaid, whereby, when the coupling-members are drawn hard together, the said thin bendable edge of the sleeve will be swaged inwardly to form an inwardly extending annular bead and a similarly shaped groove in the coupled member."

On the hearing, the court found for the defendant, and dismissed the bill for want of equity. From the claims, specification, and drawings, it will be seen that the component parts of the device of the pat-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ent in suit are a male and female coupling member and a tapered sleeve or ring as follows, viz.:

These may be termed, respectively, a nut "*A*," a cone "*B*," and a nipple "*C*."

Drawing 2 of the patent is as follows, viz.:

*Fig. 2.*

At line 96, col. 2, p. 1, of the specification, it is said:

"In connecting the union, the nut *10* and sleeve or ring *8* are first placed over the end of the pipe or tube *1*. The end of said pipe is then inserted into the open end of the bushing *3* until the end thereof abuts against the shoulder *7* at the end of the recess *6* therein. The thread of the nut *10* is then engaged with the thread on the bushing *3*, and said nut is screwed up until the small end of the sleeve or ring *8* is forced into strong engagement with the rounded edge *9* at the outer end of the recess *6* in said bushing *3*; said nut *10* being preferably turned or set up until the pressure on said tapered sleeve or ring *8* is sufficient to cause the rounded edge *9* of the bushing *3* to swage an interior bead on said sleeve or ring *8*, which will in turn swage a corresponding groove in the external surface of the pipe or tube *1*, as shown at *13*. Said bead, being interlocked with said groove, will operate in an obvious manner to prevent the pipe or tube *1* from being withdrawn from the bushing *3*."

It is evident that the device of the claims in suit does not include the pipes or rods to be coupled, since it is for a means of effecting the coupling, and not for a coupled set of pipes or rods, so that the groove in the pipe is no part of the patent. Complainant's expert was asked on cross-examination (X. Q. 80):

"And does that coupling structure include the indented pipe?"

His answer was:

"I do not so understand, but merely that it is a coupling to be applied to a pipe in the manner described, and so as to indent it, if desired."

Manifestly, therefore, Fig. 2 above shows an application of the patent to the parts to be coupled.

Appellee (termed defendant herein) interposes the defenses of want of validity and of infringement. The answer sets up a great many prior patents, of which we need consider only the following, viz.: Pat-

ent No. 91,319, granted to J. J. Fifield on June 15, 1869, for a pipe coupling. In this device, the nut "D," the tapering ring-wedge or cone "B," and the nipple "C" are shown. The specification at line 13, col. 1, p. 1, reads:

"In carrying out my invention, I employ a short tube, or auxiliary pipe, to receive the ends of the two pipes to be coupled; they being inserted into such tube from its opposite extremities. On and around the coupling tube I cut a male screw, extending from each end of the tube toward its middle and to a prismatic flange, circumscribing the coupling tube. The bore of the coupling-tube I construct bell-mouthed, or tapering near each end of it; such being to receive a ring-wedge, to encompass the pipe to be connected to the coupling-tube."

Commencing at line 1, col. 2, p. 1, it is said:

"The nuts, when so screwed against the wedge-rings, operate to crowd the said rings into the conical mouths of the tube C, and consequently force them to contract such rings, so as to cause them to embrace and fit closely to the pipes A B, and make therewith and with red lead, putty, or other suitable joint-tightening material or compound previously inserted in the said mouths, tight joints between the pipe and the coupling-tube. The taper of each of the ring-wedges, or wedge-rings, both inside and outside, should be such as to enable the putty to flow between the opposite surfaces of the coupling-pipe and the pipe surrounded by the wedge-ring."

Figure 2 of the drawings is as follows:

Patent No. 181,714, granted to H. Pennie, August 29, 1876, for pipe and hose coupling. "This invention," says the inventor at line 11, col. 1, p. 1—

"relates to a new mechanism for firmly connecting two pieces of lead pipe, rubber hose, or other soft tubing; and consists, principally, in effecting the desired result by means of an outer soft-metal shell or sleeve, which is pressed into the soft pipe or tube; also, in the arrangement of mechanism for pressing the ends of said shell or sleeve into or against the pieces of pipe to be joined, all as hereinafter more fully described."

This device has the sleeve or cone with soft tapered and reduced ends and hard middle portion. It also has coupling nuts with conical extensions differing in angle from that of the tapering ends of the cone or sleeve, whereby, when the nut is advanced upon the sleeve or cone, the reduced or tapered ends of the latter are compressed and sunk into the pipes to be coupled with such force as to insure their permanent connection with the sleeve or cone, and produce a tight joint. This patent also calls for the process.

"3. The process, herein described, of joining two ends of pipe *A B* by inserting them within a cylindrical continuous sleeve, and thereupon crowding the ends of said sleeve closely against the pipes, substantially as specified."

Fig. 2 of the patent is as follows:

Patent No. 275,193, granted to L. Grannan, April 3, 1883, for packing for valve-stems. The patentee provides for the coupling nut, the pipes to be connected, an inclosed annular recess formed around the valve-stem, into which he inserts a soft metal ring shaped like two hollow cones with joined bases, making a double cone which slips over the valve stem.

"By thus tapering the outside of the ring *F* from the center to each end of the same, a comparatively thin edge *b* is made thereon at such end that will fit around the valve-stem."

At line 62, col. 2, p. 1, (Record, p. 471) it is said:

"To apply my improved packing-ring to the valve, it is placed over the stem, the cap *E* and hand-wheel *G* being understood as removed until the lower tapering side of the ring rests upon the blunt edge made by the conical recessing of the upwardly-extending portion *B*, when the lower thin edge *b* of the ring will project into the space between the valve-stem *C* and the upright portion *B*. The cap *E* is then placed over the stem *C*, and screwed upon the upright portion *B* until the blunt edge within the cap *E*, made by the conical recessing of the same, rests upon the upper tapering side of the ring *F*. The upper thin edge *b* of the ring will project into the space between the valve-stem *C* and the cap *E*. If the cap *E* be still further screwed down upon the upright portion *B*, the blunt edges of both the cap and upright portion will force or swage the *upper and lower thin edges, b,* of the ring tightly in around the stem *C* (see Fig. 3), and prevent any leakage from the valve around the stem, which operation I find is not necessary as often with my improved packing as is the case where the usual gum or cotton packing is used."

The patent also covers the use of a single cone or ring, as in the patent in suit. The one claim reads as follows:

"The combination, with the valve-stem *C*, upright portion *B*, and cap *E*, of the soft-metal packing-ring *F*, reduced to a thin edge, *b*, adapted to project into the space between the valve-stem *C* and upright portion *B*, or into the space between the valve-stem *C* and cap *E*, or both, for the purpose specified."

Patent No. 546,906, granted to M. Sexton on September 24, 1895, for a pipe-joint.

"The invention consists principally of a sleeve, exteriorly-threaded collars screwing in the ends of the sleeve and formed at their inner ends with bevels,

and wedge-shaped rings adapted to be engaged by the bevels of the said collars and be pressed upon the pipe periphery at or near the pipe ends."

Claim 2 reads as follows:

"2. A pipe-joint, comprising a sleeve formed with an integral interior annular projection against which the ends of the pipe sections abut, packing-rings seated on the said internal projection and surrounding the said pipes, wedge-shaped rings made in detached segments or sections fitted on the pipes within the said sleeve, and collars screwing in the threaded ends of the said sleeve and formed at their inner ends with bevels adapted to engage the said wedge-shaped rings, to press the latter upon the said packing-rings and to fasten the rings on the said pipes, substantially as shown and described."

The coupling-nut, flexible tapering sleeve or gasket, the flaring receiving end of the nipple, are shown also in Cornelius application, No. 494, filed October 11, 1901; also, in substance, in patent No. 782,552, granted to J. H. Glauber on February 14, 1905, for a coupling pipe. Of the French patent, No. 340,937, complainant's expert says:

"This patent shows a pipe-coupling employing an ordinary squeeze packing, and the only way in which it differs in its showing from the patents employing packings of this character which I have already discussed is that it assumes the compression of the plastic packing-ring to have been carried so far, by the screwing up of the nut, as to crimp the pipe. The plastic material simply yields in all directions under the pressure until it completely fills the cavity of the nut beyond the end of the nipple, and, having no further channel of escape, is squeezed against the pipe itself with so much pressure as to bend it.

"As a matter of fact, this is just what must always happen with a squeeze packing, if the screwing up of the nut is carried far enough and the engaging members of the coupling are strong enough to withstand the strain. Whether the packing material is of soft metal, such as lead, or of rubber, fiber, or other elastic and compressible material, it may be ultimately molded by the pressure so as to completely fill the cavity within the nut, and then, if the screwing up of the nut continues, the action is practically that of a hydraulic press, and the pressure of the entire ring of material inwardly against the wall of the pipe will serve to bend in the latter, if, as above suggested, the coupling members are strong enough to stand the strain.

"Obviously, however, the construction and mode of operation in any such squeeze packing are not those which characterize the Burgess patent in suit, in which, as has been repeatedly pointed out, there is no deformation of the hard metal cone, except at its thin edge, and in which, consequently, the cone never takes the shape of the cavity of the nut, or varies from its original shape, except at its thin edge.

"The practical difference between the squeeze packing and the Burgess coupling is marked, particularly when it comes to uncoupling the pipes and reconnecting them, which operation, in a squeeze packing, ordinarily requires, or at least is very likely to require, the replacing of the packing material, in order to insure the tightness of the joint when the pipes are coupled a second time, whereas in the Burgess coupling the pipes may be uncoupled and recoupled repeatedly and for an indefinite number of times, without any renewals and without the least tendency to produce a leaky joint, and whereas the effect of the first setting up of the coupling nut, in the case of the Burgess coupling, is to mechanically seal the cone to the pipe around the thin edge of the cone, where it is crimped into the pipe, and in the squeeze packing, the packing material becomes united, in so far as it does so at all, to the nut rather than to the pipe, by being forced into the threads of the nut, from which it must frequently be dug out in order to be replaced, when the nut is loosened.

"Every such squeeze packing—the one illustrated in this French patent, No. 340,937, for example—is therefore distinctly different in theory and mode of operation from the coupling of the Burgess patent in suit, and fails to re-

spond in spirit or in terms to the claims of the Burgess patent, and particularly to its claims 3 and 4, inquired of."

From a perusal of the foregoing, it will be apparent that whatever invention, if any, there be in complainant's patent, must reside in very narrow bounds. It seems to be practically admitted by complainant that it resides in the angle of the taper of the cone or sleeve with relation to that of the flared mouth of the bushing or nipple, and, apparently, to some extent, in the material used in making the cone or sleeve.

In the Pennie patent, each of the coupling nuts of the double coupling parts has a conical extension which differs in angle from the taper of the leaden or other soft metal sleeve cone, the purpose of which is identical with that of the beveled mouth of the nipple in its action upon the reduced or thin end of cone of the patent in suit. In the one case, the compression of the end of the cone is effected by the beveled extension on the coupling nut, and the other, by the beveled opening at the mouth of the nipple. In each case, the thin or reduced ends are swaged and driven into the pipes or other articles to be coupled, so as to form a bead and groove connection, and consequently a tight joint.

The Grannan patent discloses a device almost identical with that of the patent in suit. While it is a packing for valve stems, it belongs to an art analogous to that of the Burgess patent. It is manifestly capable of use in pipe and rod coupling without changing its form or function. The parts are so adjusted as to force the tapered or thinned ends of the packing or double cone in a swaging manner against the valve stem. The patent does not call for the bead and groove, though it is evident it would be present, as the same conditions as to pressure prevail as in Burgess' device.

Grannan prefers to make his cones of brass. The specification calls attention to the fact that the ends of the packing or cone may be increasingly compressed. This could not fail to result in a bead and groove connection.

In the French patent, above set out, the bead and groove connection brought about by the compression of the cone or sleeve is clearly shown. It is not, however, a sinking of the end of the cone into the pipe, but one corresponding to the distorted body of the cone after compression. In view of the prior art, as above set out, it hardly seems possible that there can be anything of novelty in the invention claimed to be covered by the patent.

The trial judge, in dismissing the bill for want of equity on the ground of lack of patentable novelty, rested his decree upon the fact that the device of the patent was, for all the purposes of that hearing, substantially identical with, and anticipated by, that previously known to defendant and the McCanna Manufacturing Company.

From the evidence it appears that some time during the spring and summer of the year 1907 the McCanna Manufacturing Company caused to be made certain blue prints of the several parts of a compression coupling joint, substantially in appearance identical with those of the patent in suit. These original drawings are produced as exhibits in

the case, Nos. 2, 7, 9, and 10. On June 20, 1907, said company quoted prices to the A. Nelson Manufacturing Company on various of the coupling parts, as shown by correspondence in evidence and orally, among which were included 10,000 of the brass compression cones, in all essential respects similar to those here in suit. Receipts for payments for the parts are also shown in the record. An examination of the blue prints shows that the angle of the cone is somewhat sharper than that of the mouth of the nipple. Certain other physical exhibits, viz., spark plugs, Exhibits Nos. 48 and 50, cone, Exhibit No. 8, nipple, Exhibit No. 11, and other exhibits, Nos. 44 and 49, all made by the Nelson Company prior to date of patent, are produced. These disclose the fact that the cone will not fit into the flare of the nipple, but first strikes the same on or near its (the cone's) small end, so that, when the nut is screwed up, the thin end of the cone is forced or swaged above the pipe as in the patent in suit. So far as the evidence goes, there was no substantial difference between the McCanna-Nelson compression device and that of Burgess. The former clearly was made public in 1907, in a form adapted to practical use, and the trial court found that it was in public use, though for a period less than two years anterior to the filing of the Burgess application. The facts of the case plainly distinguish it from Mueller Mfg. Co. v. Glauber, 184 Fed. 609, 106 C. C. A. 613. Under the doctrine of Stitt v. Eastern Ry. Co. (C. C.) 22 Fed. 649, Coffin v. Ogden, 18 Wall. 120, 21 L. Ed. 821, Buser v. Novelty Co., 151 Fed. 478, 81 C. C. A. 16, Brush v. Condit, 132 U. S. 48, 10 Sup. Ct. 1, 33 L. Ed. 251, Mast, Foos & Co. v. Stover, 177 U. S. 485, 20 Sup. Ct. 708, 44 L. Ed. 856, Wilson v. Townley, 125 Fed. 491, 60 C. C. A. 327, Bates v. Coe, 98 U. S. 46, 25 L. Ed. 68, Eastman v. Mayor, 134 Fed. 844, 69 C. C. A. 628, Consolidated Fruit Jar Co. v. Wright, 94 U. S. 92, 24 L. Ed. 68, Egbert v. Lippmann, 104 U. S. 333, 26 L. Ed. 755, and Dalby v. Lynes (C. C.) 64 Fed. 376, the trial judge was right in holding that the patent in suit was anticipated by the McCanna device.

The foregoing disposes of the errors assigned. The decree of the District Court is affirmed.